UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────────x

THE STATE OF NEW YORK and THE NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION,

                              Plaintiffs,

       - against -                           05 Civ. 6211 (CM)

ROBERT P. FRIED,

                              Defendant.

────────────────────────────────────────x

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

McMahon, J.:

Plaintiffs, the State of New York and the New York State Department of Environmental Conservation ("DEC"), bring this action pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, and New York common law governing public nuisance, restitution, and indemnification, to recover all costs incurred by the State in responding to the release and threatened release of hazardous substances into the environment at and from a facility known as the NOW Corporation Site ("the Site").

Plaintiffs move for summary judgment under Federal Rule of Civil Procedure 56(c), arguing that, as the sole owner of the Site, Defendant is strictly liable under CERCLA for all response costs incurred by the State.

Defendant opposes the motion, asserting that the contamination was caused by a third party lessee, and thus that he is protected by CERCLA's third party defense. See 42 U.S.C. §

9607(b)(3).

For the reasons discussed below, Plaintiffs' motion for summary judgment is denied.

**Facts**

The relevant facts, as set forth in the Complaint, the parties' Rule 56.1 Statements, and other materials submitted in connection with Plaintiffs' motion for summary judgment, are as follows:

In 1957, Defendant Robert Fried purchased the Site, a 94.5-acre parcel of land located on Route 9G in the Town of Clinton, County of Dutchess (Site No. 314008 on the State Registry). (Cplt. ¶¶ 8-9; Pl.'s 56.1 St. ¶ 1). The Site contained a 12,000 square foot industrial building. (Fried App. ¶ 14).

In 1961, Defendant moved his metal cutting business, Modern Machine & Tool Corp. ("Modern"), to the Site, and changed its name to NOW Corp. (Fried Aff. ¶¶ 6, 12). NOW Corp. continued Modern's metal working operations and, in 1969, added an additional line of work involving the stamping of metal parts for Teflon aluminum cookware. (Fried Aff. ¶¶ 13, 16). In 1979, NOW Corp. further diversified its operations to include a plastic molding business. (Fried Aff. ¶ 44). By 1982, NOW Corp. had ceased its metal working activities altogether and was engaged only in plastic molding. (Fried Aff. ¶ 45).

The original structure located on the Site was expanded in 1966 and again in 1969, in anticipation of increased work for NOW Corp. (Fried Aff. ¶¶ 14, 15, 17). When the work did not materialize, Fried began leasing the extra space to other businesses. (Fried Aff. ¶17).

Between 1969 and 1974, Fried rented space to Virginia Chemicals Inc., which manufactured component parts for Ford automobile air conditioners. (Fried. Aff. ¶¶ 18, 31). In

2

June 1969, Virginia Chemicals and NOW Corp. entered into an agreement under which NOW Corp. would rent space to Virginia Chemicals and, in return, Virginia Chemicals would hire NOW Corp. to produce various mechanical devices for it. (Fried Aff. ¶¶ 20, 21). Additionally, NOW Corp. entered into a lease agreement with Virginia Chemicals for a term of five years, commencing on October 1, 1969, and terminating on September 30, 1974. (Fried Aff. ¶ 22). In September 1971, NOW Corp transferred the lease to Fried personally. (Fried. Aff. ¶ 24). In January 1972, Fried entered into a formal lease agreement with Virginia Chemicals. (Id.)

Notwithstanding the June 1969 Agreement between NOW Corp. and Virginia Chemicals, NOW Corp. never managed any of Virginia Chemicals' operations or manufactured any mechanical devices for it. (Fried Aff. ¶¶ 26, 28; Gillespie Aff. ¶ 6; Def.'s 56.1 St. ¶ 3). The June 1969 Agreement, however, was never formally modified or revoked. (Fried Aff. ¶ 27).

In 1974, Virginia Chemicals moved its operations to Texas and vacated the Site. (Fried Aff. ¶ 35). In return for payment for structural damage caused by Virginia Chemicals, NOW Corp. released Virginia Chemicals "from all and all manner of debts, obligations, claims, suits, actions and causes of action . . . from the beginning of time to the date of this release . . ." (Fried Aff. ¶¶ 37-39; Ex. E). At some point thereafter, Defendant learned that Virginia Chemicals had used solvent in their operations. (Fried. Aff. ¶ 34).

In 1983, Fried sold NOW Corp. The company, renamed NOW Plastics Corp., continued manufacturing plastic molding at the Site until 1989. (Fried Aff. ¶ 47). Between 1984 and 1989, Fried also leased portions of the Site to the Rhinebeck School, K&K Carpet, Tiffany Marble of New York, and South American Development Corporation. (Fried App. ¶¶ 53-54). Defendant was not involved with the day-to-day operations of any of his tenants. (Fried Aff. ¶ 55).

3

In 1989, NOW Plastics Corp. ceased operating and sold a portion of its equipment at auction to B&R Specialties, which continued manufacturing plastic molding at the Site. (Fried Aff. ¶ 68-69). Fried assisted in the operations of B&R Specialities from 1991 to 2000, at which time he became the director of B&R Specialities. (Fried Aff. ¶¶ 70-72).

In 1983, in response to complaints by neighbors of on-site disposal of tank rinsing solutions, DEC designated the Site as "class 2a" on the State Registry of Inactive Hazardous Waste Disposal Sites. (Fried Aff. ¶ 64; Pl.'s 56.1 St. ¶ 2; Vasudevan Dec. ¶ 6). In November 1983, a Phase I investigation of the Site was performed. While the results revealed that no problems existed on the Site, no air, water or soil samples were taken or analyzed. (Fried Aff. Ex. G).

In 1989, after a fire at the Site, low levels of volatile organic compounds were detected in runoff water from the Site. Further sampling detected the same chemicals in neighboring residential drinking water wells. (Fried Aff. ¶ 60; Vasudevan Dec. ¶ 7). The following year, DEC reclassified the site as "class 2," meaning that the Site constituted a significant threat to the public or the environment. (Cplt. ¶ 12; Vasudevan Dec. ¶ 7). Rather than performing the previously scheduled Phase II investigation, DEC conducted a full Remedial Investigation and Feasibility Study in 1992, which revealed groundwater contamination levels in excess of state drinking water standards for benzene, chloroethane, 1, 1 dichloroethane, 1, 2 dichloroethane, tetrachloroethane, 1, 1, 1 trichloroethane, TCE and vinyl chloride, and dichloroethane and TCE in the soil at values in excess of DEC soil cleanup standards. (Cplt. ¶ 10; Fried Aff. Ex. G; Pl.'s 56.1 St. ¶ 4; Vasudevan Dec. ¶¶ 9, 11).

Thereafter, the State began sending bottled water to nearby residents whose wells had

4

been contaminated. (Cplt. ¶ 11). Additionally, in response to DEC's request that Fried participate in an Interim Remedial Measure, Fried installed carbon filtration systems on two neighboring homes, provided periodic sampling of the water in those systems, met regularly with the DEC regarding groundwater issues at the Site, granted the DEC access to the Site to conduct further remedial investigations, including soil sampling, groundwater sampling, and soil vapor sampling, and provided information regarding Virginia Chemicals' presence at the Site. (Fried Aff. ¶ 62).

On March 31, 1995, DEC issued a Record of Decision, selecting a remedy to address the groundwater contamination at the Site. On March 28, 1996, DEC issued a Record of Decision selecting a remedy to address the soil contamination at the Site. (Cplt. ¶ 15). In implementing these remedies, the State has incurred costs totaling $2,713,436.47 (as of June 24, 2005). (Cplt. ¶ 16; Pl.'s 56.1 St. ¶ 9; Zeppatelli Dec. ¶ 23).

On July 6, 2005, Plaintiffs filed the present action to recover all costs incurred, to date and in the future, in remediating the Site. On September 15, 2005, Defendant submitted an Answer, denying liability for the contamination, and asserting numerous affirmative defenses. On February 12, 2006, Plaintiffs moved for summary judgment against Defendant.

## Standard of Review

Summary judgement is appropriate under Rule 56 when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in

[its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation" and "must do more than simply show that there is some *metaphysical doubt* as to the material facts." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Matsushita Elec. Indus. Co., 475 U.S. at 586 (citations omitted). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248.

**Discussion**

CERCLA is "a broad remedial statute" with "two primary goals: (1) enabling the [government] to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992).

The liability provision of the statute provides that, "the owner or operator of a vessel or a facility," among others, shall be strictly liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan . . ." 42 U.S.C. § 9607(a)(1)(A).

6

Though presumptively liable, a landowner can escape liability by demonstrating, by a preponderance of the evidence, that he is entitled to one of the statute's affirmative defenses. Pursuant to the so-called "third party defense":

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by –
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substances concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . .

42 U.S.C. § 9607(b)(3).

Plaintiffs move for summary judgment on the issue of Defendant's statutory liability, arguing that Defendant is not protected by the third party defense, as (1) the contamination was not caused solely (if at all) by a third party; (2) the third party's alleged release of hazardous substances occurred in connection with a contractual relationship existing with Defendant; and (3) Defendant did not exercise due care with respect to the hazardous substance concerned or take precautions against foreseeable acts or omissions of the third party allegedly responsible.

Defendant contends that summary judgment is inappropriate, as there exist numerous questions of material fact bearing on his entitlement to the third party defense. The court agrees.

A.  Causation

Plaintiffs argue that Defendant cannot invoke the third party defense because the release of hazardous substances was not caused solely by a third party. On the basis of a handful of DEC documents identifying Mr. Fried as a potentially responsible party ("PRP"), Plaintiffs conclude that Defendant was responsible, at least in part, for contamination of the Site. (Reply at 3; Fried Aff. Ex. G).

Defendant points to the same DEC documents, which also designate Virginia Chemicals and/or its successor-in-interest (Hoechst/ Celanese Corp.) as a PRP, to demonstrate that there exists a question of material fact regarding which entities or persons actually caused or contributed to the contamination. (Fried Aff. Ex. G). Mr. Fried also submits an affidavit in which he declares that NOW Corp "did not generate any liquid or chemical waste." (Fried Aff. ¶ 10). In contrast, he indicates that Virginia Chemicals "utilized solvent in their operations" and "discharg[ed] waste water to a trench drain, which led to a stream." (Fried Aff. ¶¶ 32, 34). He also points to a DEC Inactive Hazardous Waste Disposal Report, which states that Virginia Chemicals "used chemical storage tanks on site and probably disposed of tank cleaning solvents directly on the ground." (Fried Aff. Ex. G).

Significantly, neither party references, and the record is devoid of, any documents, studies, or expert reports conclusively demonstrating that the release of hazardous substances at the Site was caused by either Mr. Fried or Virginia Chemicals. In particular, there is no evidence of the type or amount of chemicals used or disposed by Virginia Chemicals; there is no evidence that the type of chemicals used by either Virginia Chemicals or NOW Corp. matches the substances found in the soil and groundwater at and around the Site; and there is no evidence

8

that the level of contamination found at the Site is consistent with the amount of chemicals used and/or dumped by either Virginia Chemicals or NOW Corp., with the time-frame that Virginia Chemicals was present at the Site, or with the precise location of Virginia Chemicals' operations at the Site.

In short, aside from DEC documents designating both Mr. Fried/ NOW Corp. and Virginia Chemicals/ Hoechst/ Celanese Corp. as *potentially* responsible parties, the record contains no evidence of causation. As movants, Plaintiffs bear the initial burden of demonstrating the absence of disputed fact. Celotex, 477 U.S. at 323. Plaintiffs have failed to make such a showing. In the absence of any evidence conclusively linking either Mr. Fried or Virginia Chemicals to the contamination, the Court cannot find that the third party defense is unavailable to Defendant.

B.     Contractual Relationship

Plaintiffs further argue that, even if the contamination was caused solely by Virginia Chemicals, Defendant cannot avail himself of the third party defense because Virginia Chemicals' "act or omission occur[red] in connection with a contractual relationship existing, directly or indirectly, with the defendant." See 42 U.S.C. § 9607(b)(3).

Defendant counters that, while he admittedly was engaged in a contractual relationship with Virginia Chemicals, the contamination did not occur "in connection with a contractual relationship." Id.

This Court has declined to find that "the contractual relationship clause embraces all acts by a third party with any contractual relationship with the defendant." Shapiro v. Alexanderson, 743 F.Supp. 268, 271 (S.D.N.Y. 1990). "Such a construction," the Court has explained, " would

9

render the language 'in connection with' mere surplusage." Id.

In emphasizing that the existence of a contractual relationship is not dispositive of the availability of the third-party defense, the Second Circuit held:

> [T]he phrase "in connection with a contractual relationship" in CERCLA [] requires more than the mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed of and a third party whose act or omission was the sole cause of the release or threatened release of such hazardous substances into the environment, for the landowner to be barred from raising the third-party defense []. *In order for the landowner to be barred from raising the third-party defense under such circumstances, the contract between the landowner and the third party must either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's actions.*

Westwood Pharm., Inc. v. Nat'l Fuel Gas Dist. Corp., 964 F.2d 85, 91-92 (2d Cir. 1992) (emphasis added); see also State of New York v. Lashins Arcade Co., 91 F.3d 353, 360 (2d Cir. 1996).

While both Westwood and Lashins involved property sales contracts, at least one court in this Circuit has held that, in the context of CERCLA's third party defense, there is no distinction between a sales contract and a lease: "[R]egardless of the type of contract, the issue is whether the contract relates to hazardous substances." Emerson Ent., LLC v. Kenneth Crosby Acquisition Corp., 2004 WL 1454389, *5 (W.D.N.Y. June 23, 2004).

It is not clear, based on the record before the Court, whether the lease entered into between Now Corp. (later transferred to Defendant personally) and Virginia Chemicals either related to the release of hazardous substances or granted Defendant some element of control over Virginia Chemicals' actions. Unlike the lease agreements in A&N Cleaners & Launderers, Inc. v. St. Paul Fire & Marine Ins. Co., 788 F.Supp. 1317 (S.D.N.Y. 1992), *rev'd on other grounds*,

and State of New York v. Westwood-Squibb Pharm. Co., Inc., 138 F.Supp.2d 372 (W.D.N.Y. 2000), which anticipated the use of certain hazardous substances by the lessee, the lease at issue in the present case did not specify the intended use of the land. (Reply at 5). Nor does the record reflect whether Defendant had knowledge, at the time the lease was executed, of type of business conducted by Virginia Chemicals or the particular chemicals used in its operations.

Plaintiffs argue that Defendant must have been familiar with Virginia Chemicals' operations, because, in addition to the lease agreement, NOW Corp. and Virginia Chemicals entered into a second contract (which was never implemented) under which NOW Corp. agreed to assist in the operations of and manufacture mechanical devices for Virginia Chemicals. (Reply at 6). However, plaintiffs' conclusory allegations regarding Defendant's knowledge of Virginia Chemicals' operations are insufficient to establish the absence of a material issue of disputed fact. Moreover, while both agreements were executed in 1969, the record does not reflect whether the agreements were executed simultaneously, whether one agreement was contingent on the other, or why the management/ manufacturing contract was never performed.

Accordingly, there exists a factual dispute as to whether the release of hazardous substances at the Site occurred "in connection" with the lease agreement between NOW Corp. and Virginia Chemicals.

C.   Due Care

Finally, Plaintiffs maintain that, even if Virginia Chemicals was solely responsible for the release of hazardous substances at the Site *and* Defendant's lease with Virginia Chemicals did not relate to the contamination, Defendant still cannot invoke the third party defense, because Defendant did not exercise due care with respect to the hazardous substances concerned, or take

11

Defendant did not exercise due care with respect to the hazardous substances concerned, or take precautions against foreseeable acts or omissions by Virginia Chemicals.

Having already concluded, however, that questions of material fact exist with respect to the first two elements of the third party defense, the Court need not reach the issue of due care at this time. Moreover, the Court anticipates the need for additional briefing on the due care requirement.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied. This case will be set for trial at the earliest opportunity.

This constitutes the decision and order of the Court.

Dated: May 2, 2006.

_____
U.S.D.J.

BY FAX TO ALL COUNSEL